**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**JUANA CONAWAY,**

     **Plaintiff,**

**vs.**                              **CIVIL ACTION NO. 2:15-15537**

**CAROLYN W. COLVIN
ACTING COMMISSIONER OF
SOCIAL SECURITY,**

     **Defendant.**

**<u>PROPOSED FINDINGS AND RECOMMENDATION</u>**

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. By Order entered January 5, 2016 (Document No. 7.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 13 and 15.)

The Plaintiff, Juana Conaway (hereinafter referred to as "Claimant"), protectively filed her application for Title XVI benefits on April 12, 2012, alleging disability beginning October 19, 2009 due to diabetes, lung cancer stage 1, fibromyalgia, muscle spasms, acid reflux, high cholesterol, high blood pressure, anxiety, depression, chronic obstructive pulmonary disease

("COPD"), asthma, joint and muscle pain, and circulation problems.[1] (Tr. at 217.) Her claim was denied on June 13, 2012 (Tr. at 92-96.) and again upon reconsideration on October 22, 2012. (Tr. at 104-110.) Thereafter, Claimant filed a written request for hearing on November 7, 2012. (Tr. at 111-113.) An administrative hearing was held on March 25, 2014 before Administrative Law Judge ("ALJ") H. Munday. (Tr. at 25-50.) The ALJ heard the testimonies of Claimant (Tr. at 35-54.) and Vocational Expert ("VE") Nancy Shapero. (Tr. at 54-60.) On April 23, 2014, the ALJ entered a decision finding Claimant was not disabled. (Tr. at 10-30.)

The ALJ's decision became the final decision of the Commissioner on September 28, 2015 when the Appeals Council denied Claimant's Request for Review. (Tr. at 1-7.) On November 24, 2015, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Standard

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 416.920(a). The first inquiry under the sequence is whether a claimant

---

[1] In her Disability Report – Appeal, dated August 7, 2012, Claimant alleged that there was a change in her condition: "right foot condition stemming from diabetic neuropathy". (Tr. at 260.) In another Disability Report – Appeal, dated November 7, 2012, Claimant alleged that since the last Disability Report, she had more pain in her hands, feet, neck, back, and experienced headaches; she was also depressed and "dont [sic] want to go anywhere due to needing help or sometime in and out of car". (Tr. at 279.)

is currently engaged in substantial gainful employment. Id. § 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. § 416.920(f). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." 20 C.F.R. § 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. § 416.920a(c). Those sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture

of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. § 416.920a(d)(1).[2] Fourth, if the claimant's impairment(s) is/are deemed

---

[2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years'

severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. § 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. 20 C.F.R. § 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. § 416.920a(e)(4).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since April 12, 2012, the application date. (Tr. at 15, Finding No. 1.) Under the second inquiry, the ALJ found that Claimant suffered from the following severe impairments: diabetes mellitus; chronic obstructive pulmonary disease (COPD); asthma; and status-post left lower lobe lobectomy. (Id., Finding No. 2.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 18, Finding No. 3.) Next, the ALJ

---

inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

found that Claimant had a residual functional capacity ("RFC") to perform light work as defined in the Regulations:

> Except she requires a sit/stand option at will while remaining on task. She should never climb ladders, ropes, or scaffolds, but can occasionally climb ramps and stairs, balance stoop, kneel, crouch, and crawl. She can have occasional exposure to extreme cold, extreme heat, pulmonary irritants including fumes, odors, dusts, and gases, and hazards, such as moving machinery and unprotected heights. (Tr. at 19, Finding No. 4.)

At step four, the ALJ found that Claimant was incapable of performing past relevant work. (Tr. at 23, Finding No. 5.) At step five of the analysis, the ALJ found that Claimant was born on February 21, 1960 and "49 years old"[3], she was classified as a younger individual as of the application date, and she subsequently changed age category to closely approaching advanced age. (Id., Finding No. 6.) The ALJ found that Claimant had a limited education and was able to communicate in English. (Id., Finding No. 7.) Employing the Medical-Vocational Rules as a framework, the ALJ determined that Claimant was not disabled, that transferability of job skills was immaterial to the determination of disability, as Claimant's age, education, work experience, and residual functional capacity indicated that there were other jobs existing in significant numbers in the national economy that Claimant could perform. (Id., Finding Nos. 8 and 9.) On that basis, the ALJ found Claimant was not disabled. (Tr. at 24, Finding No. 10.)

<u>Scope of Review</u>

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In <u>Blalock v. Richardson</u>, substantial evidence was defined as:

---

[3] The undersigned notes the identified age is in error: based on Claimant's birthdate of February 21, 1960, she would have been 52 years old on the date the application was filed.

evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Issues on Appeal

Claimant's appeal is based on three main grounds: first, is whether the ALJ erred by failing to employ the Medical Vocational Guidelines, or "the grids" which would have found Claimant disabled; second, is whether the ALJ failed to abide by 20 C.F.R. § 416.927 in evaluating Claimant's treating physicians' opinions, specifically with regard to medical evidence of her limitations from complications due to diabetes mellitus; and third is whether the ALJ failed to properly consider the combination of Claimant's impairments that contributed to her overall disability.

Claimant's Background

At the time of the application filing date, including the hearing date, Claimant was

considered a "person closely approaching advanced age".[4] <u>See</u> 20 C.F.R. § 416.963(d). She completed the ninth grade but did not obtain a GED; she attended a business college, but did not finish. (Tr. at 36, 55.) Her past relevant work experience included seamstress and cashier. (Tr. at 36-37, 218.) She also answered phones for about three years at her ex-husband's construction company. (Tr. at 56.) There are gaps in her employment history prior to her stopping work on October 19, 2009. (Tr. at 218.)

<u>The Relevant Evidence of Record</u>[5]

<u>Treatment for Diabetes/Foot Care:</u>

Rajesh Sehgal, M.D. drafted a "hematology/oncology" clinic note dated February 10, 2012 that stated Claimant had a normal gate and no sensory or motor deficits. (Tr. at 712, 713.) On June 12, 2012, Claimant's primary treating physician, Dr. John Clark, referred her to West Virginia Foot Care Specialists, John B. White III, DPM, for fungus on both of her heels; she experienced "a pain level of a 9 when standing or walking" but not at resting position. (Tr. at 734.) She also had blisters under the skin of her right foot and this infection began to spread to her left foot; Claimant reported that the burning and painful sensation from the infection was severe. (<u>Id</u>.) A psoriatic rash was observed all over her heels and the balls of her feet. (Tr. at 735.) On examination, it was noted that Claimant also experienced burning and numbness in both feet and lower extremities. (<u>Id</u>.) She was assessed with the following: "diabetic, non-insulin dependent, vascular; nails callous hyperkeratosis; nails, elongated nails; nails, onychomycosis; arthritis; bunion; hammertoe; neuropathy; braky metatarsalgia bilateral left foot; heel spur bilateral; shortened 4th

---

[4] Claimant states that she is currently 56 years old (Document No. 13 at 3.); she would now be considered a "person of advanced age" per 20 C.F.R. § 416.963(e).
[5] For the sake of brevity, the undersigned has reviewed the evidence relevant to this appeal as outlined by the parties.

metatarsal left side; posterior tibial tendon dysfunction (PTTD) bilateral; arthritis bilateral; and joint narrowing in the first MPJ bilateral." (Tr. at 735-736.) Treatment that day included debridement of hyperkeratotic lesions and non-dystrophic nail plates, as well as x-rays taken of both feet. (Tr. at 736.) For her heels, the plan was for ultrasound therapy and for Claimant to use prescription ointments, "pxd nlf1, skin relief, and dpn1" however, she "declined all 3 products" (Id.); therefore, a bilateral EMG was ordered on June 14, 2012, which confirmed "very mild sensory motor polyneuropathy." (Tr. at 739, 751-752.)

During a follow up appointment on June 20, 2012, Dr. White noted that Claimant did not get any of the "pxd medication did not get nlf1, did not get dpn1, and did not get skin relief but is wondering why things have improved so little." (Tr. at 737.) Claimant received an injection in her right heel for pain. (Tr. at 739.)

By her next appointment on June 27, 2012, she reported using "skin relief nfl1 and dpn1" and was "really impressed with how skin has improved in a just a couple of days." (Tr. at 740.) She also received ultrasound therapy for her right heel. (Tr. at 742.) During an appointment on July 11, 2012, Claimant reported that she had pain in her right heel and "is ready for a shot again since it helped the most of everything", however, she had not been using the skin relief because she "was just too busy and had no electric last week." (Tr. at 743.) Claimant received another injection to her right heel as well as ultrasound therapy for her right heel and ball. (Tr. at 745.) During a follow up visit on July 25, 2012, Claimant reported still having bilateral heel pain that has increased, and that the lesions on the bottom front of her foot were painful. (Tr. at 747.) She was treated for bilateral lesions and provided ointment to apply to her feet every three days with bandages. (Tr. at 749.)

Dr. White's examinations of Claimant's neurologic, vascular, and muscle strength systems were essentially normal during each visit. (Tr. at 735, 738, 741-742, 744-745, 748-749.) Medical records from Family Care dated November 9, 2012 and December 3, 2012 indicated that Claimant's "motor functions unimpaired" (Tr. at 857, 865.) Nancy Dunn, Ed.D, APRN, FNP-BC, observed in a treatment note dated February 7, 2014 that Claimant had normal gait and station; Claimant did not report any complications from her diabetes mellitus. (Tr. at 882, 883.) Because of her complaints of leg pain, on February 19, 2014 Dr. Dunn ordered an ultrasound of Claimant's lower extremities, which revealed "[m]ildly elevated bilateral ankle brachial indices." (Tr. at 909.)

Treatment for Back/Shoulder Pain:

On March 9, 2011, Claimant presented to Cabell Huntington Hospital with back pain that was sharp and sudden. (Tr. at 484.) Claimant had been undergoing chemotherapy since February 28, 2011, by Rajesh Sehgal, M.D. since undergoing a left lobe lobectomy. (Tr. at 472.) A consultation note dated March 10, 2011 indicated that Claimant had been developing back and flank pain as well as nausea, vomiting and dehydration which was affecting her renal function. (Id.) Claimant's renal impairment was corrected with IV fluid. (Tr. at 478.) An x-ray of her lumbar spine was also taken, revealing "mild degenerative changes" that included "mild disc space narrowing at L4-5, multilevel anterior osteophyte formation throughout the spine with no significant disc space narrowing". (Tr. at 493.)

During a follow up appointment with Dr. Sehgal on February 10, 2012, Claimant did not complain of nausea, vomiting, or diarrhea, but complained of joint pains, however, no deformity, swelling or redness were noted, and she had "normal range of motion without obvious weakness of all extremities"; she presented with a normal gait. (Tr. at 712-713.) Dr. Sehgal noted "[n]o

physically strenuous activity, but ambulatory and able to carry out light or sedentary work (e.g. office work, light house work)". (Tr. at 712.)

On November 9, 2012 Claimant saw Nancy Dunn, FNP to establish care for her back pain, reporting that it had been present for a couple of years and getting worse, with pain rated as 10/10 on a bad day and 8/10 on a good day. (Tr. at 855.) Nurse Practitioner Dunn noted Claimant was in no apparent distress, with motor functions unimpaired, and advised Claimant to diet and exercise. (Tr. at 856-857.) A follow up visit on November 15, 2012 indicated Claimant complained of hypertension and that her vision got blurry at times. (Tr. at 858.) She was given .1 mg clonidine and advised to increase fluids, begin walking, and to take medications regularly. (Tr. at 858, 860.) On December 3, 2012, Claimant returned for blood pressure medication refills and reported that "she is doing ok"; she did not report any back pain. (Tr. at 864.) Again, she was advised to diet and exercise. (Tr. at 865.)

On February 7, 2014, Claimant presented to Dr. Nancy Dunn and had a physical examination that revealed crepitus in her right shoulder and in both knees; it was noted Claimant had reduced range of motion in the right shoulder. (Tr. at 882.) Claimant appeared healthy, ambulated normally, with a normal gait and station. (Tr. at 881-882.) An examination of Claimant's back had normal curvature. (Tr. at 882.) X-rays were ordered of her knees and right shoulder: no abnormalities were found in the left knee (Tr. at 915.); the right knee revealed "mild patellofemoral joint space narrowing" but was otherwise "unremarkable" (Tr. at 916.); and the right shoulder revealed "mild joint space narrowing and mild to moderate spurring right acromoclavicular joint. Tiny calcium deposition seen near the insertion site of the rotator cuff tendon. This could be early calcific tendonitis. [] otherwise appears unremarkable." (Tr. at 917.)

Treatment for COPD/lung cancer:

After complaining of chest pain for six to seven months, in August 2010, abnormal CT scans revealed Claimant had a left lung nodule resulting in a left lower lobectomy on September 29, 2010. (Tr. at 309-341, 417-469.) Claimant was diagnosed with a non-malignant 1.4 millimeter adenocarcinoma of the left lower lobe of her lung. (Tr. at 318). The surgery was "uncomplicated" and she "did quite well and ambulated well". (Id.) Claimant was discharged on October 5, 2010 with a follow up appointment with the surgeon, Nepal Chandra Chowdhury, M.D. in two weeks; she was instructed to walk daily and maintain a low cholesterol diet. (Tr. at 319.)

State Agency Medical Consultant:

On June 12, 2012, Henry Scovern, M.D. reviewed the evidence in connection with Claimant's initial application, and opined that she could perform her past relevant work as a cashier. (Tr. at 62-72.) On October 12, 2012, Narendra Parikshak, M.D. reviewed the evidence in connection with Claimant's request for reconsideration and affirmed Dr. Scovern's findings. (Tr. at 74-85.)

The Administrative Hearing

Claimant Testimony:

Claimant testified that she last worked as a seamstress for about a year. (Tr. at 36.) Prior to that, she worked as a customer service supervisor at K-Mart for about a year or year and a half. (Tr. at 37.) She testified that she quit working when she was diagnosed with diabetes but her body "was rejecting the medication" causing her to pass out. (Tr. at 38.) Eventually, her medication was adjusted allowing her body to handle it. (Id.) She testified that due to her diabetic condition, she has neuropathy, and is in constant pain from her knees to her feet. (Tr. at 39.) She testified that she

12

gets no relief from her neuropathy and did not take was medication for it. (Tr. at 40.) Claimant testified that her podiatrist has told her to try to walk more or exercise, but she did not find that helpful. (Tr. at 41.) She admitted that no doctor has placed her on any limitations due to her neuropathy. (Tr. at 42.)

Claimant has pain in her middle to lower back that she described as a shock or little tingle that sometimes knocked her down to her knees. (Tr. at 42-43.) She testified that she does not receive treatment or medication for her back pain. (Tr. at 43.)

Claimant testified that she was diagnosed with renal insufficiency as a result of her diabetes. (Id.) She has an aching pain in her kidneys constantly, though some days or worse than other days, but the bad days occur about four or five days out of the week. (Tr. at 44.) She takes no medication for her kidneys and has only seen her kidney doctor twice, but he does not want her on medication because it can make her kidneys worse. (Tr. at 44-45.)

In 2010, she had been diagnosed with lung cancer, and had half her lung removed. (Tr. at 45.) As a result, it hurts when she takes deep breaths. (Id.) She has also been diagnosed with COPD, that causes her to run out of breath when she climbs stairs. (Id.) Cold air aggravates this condition and in hot weather, she gets asthma attacks. (Tr. at 46.) For her breathing issues, she takes Advair and Proventil. (Id.)

Due to blurry and cloudy vision, she had her eyes checked for glaucoma; she was prescribed bifocals, although that did not absolve the issue. (Tr. at 47.)

Claimant takes medication for depression and anxiety; her depression makes her feel like not going anywhere. (Tr. at 48.) She does not have a social life, she does not want to be around anyone or do anything, and just wants to sleep all the time. (Tr. at 48, 53-54.) She does not have

side effects from her medications. (Tr. at 53.) Her anxiety makes her shaky, jumpy and had in the past panic episodes. (Tr. at 49.) She sometimes loses focus and concentration for no reason. (Id.)

Claimant sees her children and grandchildren once every couple of weeks. (Tr. at 50.) She is married, but separated from her husband, who still provides for her. (Id.) She does not drive because she has a lot of dizzy spells, so her children take her everywhere. (Tr. at 51.) She does some chores around her apartment, but usually, her children take care of those. (Id.) She can walk her dog for about fifteen minutes, and can dust sometimes, but she cannot vacuum because of her shoulder. (Tr. at 51, 53.) She does not grocery shop on her own, and sometimes will go with her children for grocery shopping; she prepares microwaveable meals. (Id.) Her daughter does her laundry for her. (Tr. at 52.) To keep herself busy, she watches TV, tries to walk her dog, plays games on her computer, or does jigsaw puzzles. (Id.)

Claimant testified that she can stand about 15 minutes before she has to change position or sit down. (Id.) She cannot lift anything because her right shoulder and back hurt, sometimes, not even a cup of coffee. (Id.) On a good day, she can pick up a gallon of milk, but on a bad day she will use her left hand. (Tr. at 53.)

<u>Vocational Expert ("VE") Nancy Shapero Testimony:</u>

The VE described Claimant's past work as a cashier as light work, as a kitchen busser as medium work, as a seamstress as medium work, and as a receptionist as sedentary work. (Tr. at 56-57.) The ALJ posed a hypothetical to the VE of an individual with Claimant's age, education and past jobs with postural limitations in the light exertional level, to which the VE responded that Claimant's prior work as a cashier and receptionist would be available. (Tr. at 57-58.) With the additional limitation that the individual would require a sit/stand option at will, the VE testified

that the receptionist job would be available, as well as other jobs including assembler, hand packer, and price marker. Claimant's representative asked the VE if the individual would be off task one-third of the day, where she could not sit more than 20 to 30 minutes at a time and be off task for the remainder of the hour, the VE testified that none of the jobs she listed would be available. (Tr. at 59-60.)

Claimant's Challenges to the Commissioner's Decision

Claimant contends that the ALJ's decision is not supported by substantial evidence and raises several issues in support of her argument. (Document No. 13.)[6] First, Claimant states that the ALJ did not abide by the Medical Vocational Guidelines based on her age[7], education and work history: as an individual "closing approaching advanced age" and of limited education, and with unskilled work experience, who has limitations to light work as a result of her impairments warranted a finding that she was disabled pursuant to Pt. 404, Subpt. P, App. 2, § 202.00. (Document No. 13 at 8.) Claimant states that she is currently of advanced age and would be considered disabled under the Rules. (Id. at 9.)

Next, Claimant contends that the ALJ violated 20 C.F.R. § 416.927(c) by not giving proper weight to the opinions of her treating physicians. (Id. at 9.) Claimant argues that the ALJ ignored

---

[6] Claimant submitted numerous documents, marked as "Exhibit A" through "Exhibit K", which are cited throughout her brief in support of her arguments. (Document No. 13-1.) The undersigned has reviewed each of these "Exhibits" and notes that all are medical records, except "Exhibit K" which is a print off from the Social Security website of the Program Operations Manual System (POMS) for using the Medical-Vocational Guidelines. The remaining "Exhibits" are medical records that were not part of the transcript and were not submitted to the ALJ or to the Appeals Council. The undersigned notes that "Exhibits A, B, C, E, F, G, H, and I" all post-date the hearing, with several records dating from over a year since the administrative hearing. Only "Exhibit J" is part of the record evidence before the ALJ. "Exhibit D" appears to be an incomplete medical record dated March 19, 2013 from Family Care due to the notation at the bottom of the document "** THIS NOTE CONTINUED ON NEXT PAGE **". Claimant has not argued that any of these medical records constitute new and material evidence or provided any reason why "Exhibit D" was not submitted prior to the administrative hearing for the ALJ's consideration. The undersigned will address these "Exhibits" *infra*.
[7] Claimant was 54 years old at the time of the administrative hearing. (Document No. 13 at 8.)

her diagnoses by her treating physicians and instead determined her impairments were not severe, which was an impermissible lay opinion. (Id. at 9-11.) The ALJ's failure to consider Claimant's severe physical impairments and resulting exertional limitations rendered an incomplete and inaccurate hypothetical to the VE, which warrants reversal. (Id. at 11-14.)

Finally, Claimant argues that the ALJ failed to account for all of her impairments, both severe and non-severe, pursuant to the sequential evaluation under Section 416.920. (Id. at 14-17.)

The Commissioner responds that the decision is supported by the substantial evidence and that the ALJ correctly applied the Medical-Vocational Rules: she was limited to light work, had a limited education, had past relevant semi-skilled work as a cashier with no transferable job skills and was closely approaching advanced age which directs a finding of not disabled. See 20 C.F.R. Part 404, Subpart P, App. 2, Rule 202.18[8]. (Document No. 15 at 5-6.) The Commissioner points out that this Court is limited to reviewing the record prior to the date of the ALJ's decision per Section 416.330. (Id. at 6.)

Next, the Commissioner contends that Claimant provided no treating opinion evidence that she was disabled, only her subjective complaints and diagnoses which in and of themselves are not disabling impairments. See, Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986.) (Id. at 7.) Moreover, the Commissioner argues that the ALJ reasonably found Claimant's subjective complaints not entirely credible, which was at the ALJ's sole discretion and such a finding is entitled to deference. Johnson v. Barnhart, 434 F.3d 650, 658 (4th Cir. 2005.); 20 C.F.R. § 416.929; SSR 96-7p, 1996 WL 374186, at *5. (Id. at 8-11.) Contrary to Claimant's assertion that the ALJ

---

[8] The undersigned notes that this Rule pertains to a "younger individual" (age 18-49), however, as discussed *infra*, when considering Claimant's actual age category, as an individual "closely approaching advanced age" (age 50-55), the finding of "not disabled" would be the same.

should have obtained medical expert testimony, the Commissioner argues that the ALJ has discretion for same, and may do so if the ALJ finds the evidence insufficient to make a disability determination which did not occur in this case. (Id. at 12.) In addition, the Commissioner argues that the ALJ's hypothetical to the VE reflected the evidence of record, which included Claimant's age, education, vocational history, and the RFC is solely determined by the ALJ to assess what Claimant can still do despite her limitations. (Id. at 12-13.)

The Commissioner argues that Claimant did not establish that she was disabled as of the date of her application through the date of the ALJ's decision pursuant to 20 C.F.R. §§ 416.202, 416.330, 416.501 because the medical evidence during this period indicated that she was only treated conservatively, and further, her citing extra-record evidence fails to meet the criteria for a sentence six remand. (Id. at 3-5, 13-19.) The Commissioner points out that Claimant's Exhibits A-C, H, I do not pertain to the relevant time period, are cumulative, and further fail to demonstrate work-preclusive restrictions during the relevant time period. (Id. at 14.) Additionally, Exhibit J, from the relevant period, but not new evidence, suggests no limitations, and Claimant provides no good cause why it was not submitted earlier. (Id. at 14-15.) Claimant can file a new application if she experienced a deterioration in her condition since the ALJ's decision. See, Pauley v. Astrue, 2012 WL 3144593, at *23 (S.D.W.Va. Aug. 1, 2012). (Id. at 15.)

Analysis

As a preliminary matter, the undersigned agrees with the Commissioner that this Court's review is limited to the period marked be the application date through the date of the ALJ's decision, and that the after-acquired evidence, submitted for the first time upon appeal from the Appeals Council's decision, is beyond the scope of review. See 20 C.F.R. § 416.330; Wilson v. Apfel, 179

17

F.3d 1276, 1279 (11th Cir. 1999.) Accordingly, the judicial review herein is limited to the evidence submitted to the ALJ, as Claimant's complaints only concern the ALJ's treatment of same, and there has been no argument by any party that the after-acquired evidence contained in Document No. 13-1 is new and material, or that good cause existed for the failure to produce same prior to this appeal, or even if it would have changed the ALJ's opinion in this matter. See 42 U.S.C. § 405(g) (sentence six); Wilkins v. Secy., Dept. of Health & Human Servs., 953 F.2d 93, 96, n.3 (4th Cir. 1991); Borders v. Heckler, 777 F.2d 954, 955 (4th Cir. 1985).

The Medical-Vocational Rules

Beginning with Claimant's argument that the Medical-Vocational Rules would have directed a finding that she was disabled, the undersigned notes that pursuant to 20 C.F.R. Part 404, Subpart P, App. 2, Rule 202.11, an individual such as Claimant, who was limited to light work, had a limited education, had past relevant semi-skilled work as a cashier with no transferable job skills and was closely approaching advanced age directs a finding of **not disabled**. The following is a discussion of the ALJ's review of the objective medical evidence that supported such a finding:

The ALJ examined each of Claimant's alleged impairments with the medical evidence of record: the ALJ acknowledged that Claimant was being treated for diabetes mellitus by Dr. John Clark. (Tr. at 15.) Although Claimant initially had difficulties adjusting to her medication for diabetes, causing her to quit her job as a seamstress, she eventually got her sugar levels controlled, enough to attempt to return to work. (Tr. at 19.) Because her diabetes was well controlled, and she had no further complications as a result of her medication or the disease itself, the ALJ found it did not meet or equal the Listings. (Tr. at 18.) Claimant testified that she had "neuropathy that [felt] like walking on hot coals or needles and she [had] constant pain in her feet and legs and

nothing seems to help." (Tr. at 19.) Claimant "relies on her treating physician for treatment", but had been referred to Dr. John White[9], a podiatrist, for specialized care, and he "advised exercise and increase walking." (Id.) Claimant had not been advised of any limitation due to her neuropathy. (Id.) The ALJ further noted that the most recent treatment notes referencing Claimant's diabetes suggested her sugar levels were controlled; that a diagnostic study in June 2012 by Dr. Darshan Dave reported "very mild sensory motor polyneuropathy"; that a February 2014 Doppler ultrasound "showed only mildly elevated ankle brachial indices with mild stenosis and no evidence of occlusion in the lower extremities"; and that a February 2014 neurologic examination was normal. (Tr. at 21.) Despite the evidence indicating that Claimant failed to follow prescribed treatment, specifically with regard to her podiatric/diabetic issues, when she did comply, treatment was reportedly successful. (Tr. at 21-22.)

The ALJ also acknowledged Claimant was treated for COPD by Dr. Fadi Alkhankan. (Tr. at 15.) The ALJ reviewed the evidence stemming from Claimant's left lower lobectomy, and noted that the medical records indicated that the "cancer is in remission and likely cured", with "no malignant cells present" and "no evidence of metastatic disease, and that after having "completed one course of chemotherapy", Claimant "refused further treatment." (Tr. at 16.) Dr. Clark's physical examination of Claimant's lungs revealed normal functioning. (Id.) In May 2012, Dr. Dunn's physical examination of Claimant's lungs mirrored Dr. Clark's findings nearly two years later, in February 2014. (Id.) Because of these normal findings, the ALJ determined Claimant's lung impairment to be not severe. (Id.) This impairment likewise did not meet or equal the Listings

---

[9] The ALJ took note that Claimant's representative "attempted to minimize the evidence provided" by Dr. Clark "by noting that he was not a 'MD', however, the ALJ correctly noted that licensed podiatrists are "acceptable medical sources" by the Regulations. (Tr. at 21.)

due to the lack of evidence of reduced forced expiratory volumes and/or forced vital capacity. (Tr. at 18.) Similarly, the ALJ found that Claimant's asthma condition failed to meet or equal the Listings because Claimant experienced no attacks requiring hospitalization. (Id.) Moreover, the ALJ found that the combination of Claimant's COPD, asthma, and left lower lobectomy did not meet or equal Listings due to the lack of evidence to substantiate same. (Id.) Despite Claimant's allegations that deep inspiration caused her pain and that she suffered from shortness of breath on exertion, the ALJ noted that evidence provided by Dr. Alkhankan showed normal respiration, no wheezing, rhonchi, or rales. (Tr. at 20.) The ALJ found that the evidence was the same during a February 2014 examination – breath sounds were normal with good air movement. (Tr. at 21.)

For several other medical conditions, including fibromyalgia, osteoarthritis, hypertension, and hyperlipidemia, Claimant was treated by Drs. Clark and Dunn; medication was prescribed for hypertension and hyperlipidemia. (Tr. at 16.) Though radiology reports in February 2014 indicated Claimant had mild degenerative joint disease as well as mild degenerative changes in her lumbar spine, examination of the musculoskeletal systems were normal, save the crepitus found in the right shoulder and both knees. (Id.) The ALJ noted, however, the records indicated Claimant had "normal gait and station" and due to her complaints of chest pain, the exercise stress test was negative, though Claimant's left ventricular wall motion and systolic function was normal. (Id.) The ALJ therefore determined these impairments non-severe. (Id.) Moreover, the ALJ recalled Claimant's testimony that she received no medication for her back pain, despite her alleged limitations caused by it. (Tr. at 19.) Further, despite Claimant's testimony that she was limited in her ability to perform household tasks as a result of her physical impairments and can only lift a gallon of milk on a good day because of her right shoulder pain, the ALJ noted that she can wash

dishes, walk her dog, dust, prepare simple meals, play on her computer, do puzzles, watch television, reported no side effects from her medication, physical examinations were "unremarkable", range of motion was normal, and Claimant was advised to diet and exercise. (Tr. at 20, 21.)

Despite alleged renal insufficiency and being treated by a specialist twice, the ALJ noted that Dr. Jonathan Zuniga advised Claimant of the importance of salt and fluid restriction compliance for her blood pressure and fluid management. (Tr. at 16.) Renal insufficiency was a result of Claimant's response to chemotherapy, however, abdominal ultrasound findings were normal. (Id.) Accordingly, the ALJ found this impairment non-severe as well. (Id.) Although Claimant alleged having constant, aching pain in her kidneys, she did not take medication because her doctor advised it would cause them more harm. (Tr. at 19-20.)

Claimant received treatment for depression and anxiety by Drs. Clark and Dunn, and the ALJ recounted Claimant's testimony that she was not currently in mental health treatment. (Tr. at 17.) Dr. Dunn observed Claimant's mental status as normal in February 2014; Claimant's mental health conditions were managed with medication. (Id.) Therefore, with regard to Claimant's mental health, the ALJ found them non-severe. (Id.) In addition to the aforementioned medical evidence, as well as Claimant's self-reports regarding her activities of daily living, the ALJ found them unlimited. (Id.) Regarding her social functioning, the ALJ found same mildly restricted, as Claimant reported visiting with her children at their homes, and going out with them shopping, although she had no other social activities. (Id.) Regarding concentration, persistence or pace, the ALJ found Claimant mildly impaired, due to her reliance on her daughter to remind her to take her medications, that she did drive, but had not driven in a year, manages her own finances, was able

to pay attention and follow directions, and by keeping busy with cross word puzzles and having formerly cross-stitched. (Id.) The ALJ found no evidence that Claimant had any episodes of decompensation. (Id.) Due to the combined "mild" restrictions found in the first three functional areas and no episodes of decompensation, the ALJ concluded Claimant's medically determinable mental impairments were non-severe. (Tr. at 18.) The ALJ noted that Claimant testified that her depression caused her to sleep all the time and that she does not have any social activity outside of family and that her anxiety made her nervous and easily startled, however, Claimant was not being followed by a specialist and did not have any panic attacks on a current basis, although her focus and concentration varied. (Tr. at 20.)

As a result of the foregoing, the ALJ noted that the effectiveness of Claimant's treatment and medications were "generally successful in controlling [her] symptoms" (Tr. at 21, 22.), that there were no reported side effects from her medications which would interfere with the jobs for which Claimant could still do (Tr. at 21.), that treatment had been conservative, and that no treating or examining physician had imposed restrictions precluding work activity (Id.), it is apparent that the ALJ correctly applied the Medical-Vocational Rules or "grids" in this case. Accordingly, the undersigned finds that Claimant's alleged error on this ground lacks merit.

Treating Physician Evidence

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. § 416.927(c)(2). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is

not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. § 416.927(c)(2). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. Id. If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. § 416.927(c)(2)(i) and (ii)-(6). These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. § 416.927(c)(2).

The undersigned's discussion of the ALJ's review of the evidence from Claimant's treating physicians *supra*, indicates that it is clear that the ALJ gave a thorough examination of same. The undersigned's review of the evidence of record, much like the ALJ's review of the evidence of record, imposed no limitations upon Claimant with respect to her abilities to perform light work: for instance, it is noteworthy that in February "2011"[10], the ALJ noted Claimant "was advised no strenuous activity but was ambulatory and able to carry out light or sedentary work such as office work and light housework." (Tr. at 21.) Indeed, there appears to be no conflicting evidence on that issue, therefore, the ALJ's findings with respect to Claimant's treating sources and ultimately, her decision based upon the evidence provided by them is rational.[11]

---

[10] The ALJ cited this record was from February 2011 "(Exhibit 13F, p. 27)", the undersigned notes that the transcript cites this record from February 18, 2011 was by Dr. Sehgal. (Tr. at 779.) Dr. Sehgal repeated his finding in a report dated February 10, 2012 (Tr. at 712.); it is notable that these reports concerned Claimant's chemotherapy treatment post-status left lower lobe lobectomy.

[11] Pursuant to Oppenheim, 495 F.2d at 397, *supra*.

Claimant also contends that the ALJ's failure to properly evaluate her treating physician's opinions under Section 416.927 carried over into a flawed RFC assessment. However, as detailed above, the Claimant's alleged error has no merit, and further, it is well known that the RFC determination is an issue reserved to the Commissioner. See 20 C.F.R. § 416.920.

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

> Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

It is also important to note that the Fourth Circuit recognized that "remand may be appropriate...where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015) (Citing Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)). As noted *supra*, the ALJ noted that none of Claimant's severe impairments met the Listings in the Regulations (Tr. at 18.) and that the objective medical evidence of record, which the ALJ cited for each impairment, did not support Claimant's subjective complaints and alleged limitations. (Tr. at 20, 22.) Remand would be inappropriate and unnecessary in this case, as the ALJ adequately explained her findings supporting her decision, allowing for meaningful judicial review. Accordingly, the undersigned finds that Claimant's arguments that the ALJ violated the evaluation procedure dictated by the Regulations with respect to her treating physicians lack merit.

Finally, with respect to Claimant's argument that the ALJ failed to consider the combination of her impairments, both severe and non-severe, merited a finding that she was

disabled, the undersigned disagrees. Notably, the ALJ also considered all the opinion evidence of record, none of which supported a finding that Claimant was disabled: in June 2012, Dr. Henry Scovern, State agency medical consultant concluded Claimant could perform full light exertion and could perform past work as a cashier (Tr. at 22.); in October 2012, Dr. Narendra Parikshak, another State agency medical consultant, had the same conclusions as Dr. Scovern (Id.)[12]; Drs. Mercedes DeCubas and John Todd both opined Claimant's mental impairments were non-severe and had only mild limitations in concentration, persistence, and pace (Id.)[13]; Dr. Rafael Gomez, State agency medical consultant, limited Claimant to light exertional level (Tr. at 23.); and finally, Dr. Jeff Boggess, State agency psychological consultant, found non-severe mental impairments with only mild restrictions in social functioning, concentration, persistence and pace. (Id.) The ALJ gave "great weight" to these last two opinions because they more accurately reflected the evidence of record. (Id.) As a result of the ALJ's thorough analysis of the record, and supporting each of her findings with specific citations to the evidence of record, the decision is supported by substantial evidence, accordingly, the undersigned finds no merit in Claimant's allegation that the ALJ erred by failing to consider the combination of all her impairments.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's Motion for Judgment on the Pleadings (Document No. 13.), **GRANT** the

---

[12] The ALJ gave the opinions of Drs. Scovern and Parikshak "partial weight" because neither examined Claimant nor based their opinions on the most recent evidence of record, which the ALJ found to provide additional postural and environmental limitations. (Tr. at 22.)

[13] The ALJ also assigned "partial weight" to these psychological consultants' opinions because new evidence supported Claimant had mild limitations in social functioning. (Tr. at 22-23.)

Defendant's Motion for Judgment on the Pleadings (Document No. 15.), and **AFFIRM** the final decision of the Commissioner.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Copenhaver, and this Magistrate Judge.

The Clerk of this court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: December 5, 2016.

Omar J. Aboulhosn
United States Magistrate Judge